07-5125-cv
*Operating Local 649 v. Smith Barney Fund Management LLC*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2008

(Argued: March 5, 2009                                    Decided:  February 16, 2010)

Docket No. 07-5125-cv

_____

OPERATING LOCAL 649 ANNUITY TRUST FUND,

*Plaintiff-Appellant*,

KATHERINE E. SHROPSHIRE, HAROLD LEVINE, SEYMOUR RATNER, JEFFREY WEBER, individually

and on behalf of all others similarly situated, SARA BRINN,

CONSOLIDATED-PLAINTIFFS,

JEANNE CHILTON, *individually and on behalf of all others similarly situated*,

PLAINTIFF,

— v .—

SMITH BARNEY FUND MANAGEMENT LLC, CITIGROUP GLOBAL MARKETS, INC., LEWIS DAIDONE, THOMAS JONES,

*Defendants-Appellees.*

_____

Before:

B.D. PARKER,

*Circuit Judge,*[*]

and HAIGHT,

*District Judge.*[**]

_____

Plaintiff-Appellant Operating Local 649 Annuity Trust Fund appeals from a judgment of the United States District Court for the Southern District of New York (Pauley, *J.*), dismissing claims brought under§ 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 and § 36(b) of the Investment Company Act of 1940. *See* Fed. R. Civ. P 12(b)(6). The judgment is VACATED and REMANDED in part and AFFIRMED in part.

_____

Joseph R. Seidman, Jr. *for* Bernstein Liebhard & Lifshitz, LLP, New York, N.Y., Richard Acocelli, *for* Weiss & Yourman, New York, N.Y., *for Appellants.*

Christopher Meade, *for* Wilmer Cutler Pickering Hale and Door, LLP, New York, N.Y., Michael O. Ware, *for* Mayer Brown LLP, George I. Terrell, Alex Bourelly, Robert K. Kry, *for* Baker Botts, LLP, Houston, T.X., *for Appellees*

---

[*] The Honorable Sonia Sotomayor, originally a member of this panel, was elevated to the Supreme Court on August 8, 2009. The two remaining members of the panel, who are in agreement, have determined the matter. See 28 U.S.C. § 46(d); Internal Operating Proc. E; *United States v. Desimone*, 140 F.3d 457 (2d Cir. 1998).

[**] The Honorable Charles S. Haight, Jr., United States District Court Judge for the Southern District of New York, sitting by designation.

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Plaintiff-appellant Operating Local 649 Annuity Trust Fund ("Local 649") appeals from a judgment of the United States District Court for the Southern District of New York (Pauley, *J.*) dismissing claims alleging securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, and breaches of fiduciary duty in violation of § 36(b) of the Investment Company Act of 1940.[3] *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 80a-35(b). The claims were asserted in a class action brought on behalf of investors, including Local 649, the lead plaintiff, who purchased shares in the 105 mutual funds that are part of the Smith Barney Family of Funds ("Funds") between September 11, 2000 and May 31, 2005.

Various affiliates of Citigroup sponsored and managed the Funds. Smith Barney Asset Management, LLC ("Smith Barney") and Citigroup Global Markets, Inc. ("Global Markets" or "CGMI") served as investment advisers. Both Smith Barney and Global Markets were part of Citigroup Asset Management ("CAM"), a business unit of Citigroup that provides investment advisory and management services to Citigroup-sponsored funds. During the Class Period, Thomas Jones served as the Chief Executive Officer of CAM, while Lewis Daidone served as its Senior Vice President.

According to Local 649's complaint, whose allegations we accept for the purposes of this appeal, Smith Barney negotiated a contract for transfer agent services that saddled the Funds with

---

[3] This case was argued in tandem with *The Chiumento Group v. Operating Local 649 Annuity Trust Fund,* No. 07-5257-cv, which we resolve in a separate opinion.

3

excessive, misleadingly disclosed fees, a significant portion of which were, in essence, kicked back to a Smith Barney affiliate. Specifically, the scheme unfolded as follows: From 1994 through September 30, 1999, an outside contractor, First Data Investor Services Group ("First Data"), provided transfer agent services for the Funds. Transfer agents do a number of things. They process transactions in Funds shares, calculate daily net asset values, compute sales charges and commissions, distribute proxy and other materials, operate customer service centers and perform various accounting functions. As is customary, CAM paid First Data's transfer agent fees using Fund assets, an expense that CAM publicly disclosed, in accordance with Securities and Exchange Commission ("SEC") rules, under the heading "Other Expenses."

In 1997, CAM initiated a formal study of the transfer agent function in anticipation of the expiration of the existing contracts between the Funds and First Data. To assist with the study, CAM retained Deloitte & Touche Consulting ("Deloitte"). Looking to save money, CAM asked Deloitte to research and report on whether CAM could take over the transfer agent functions, rather than continue to contract with an outside agency such as First Data. Ultimately, Deloitte proposed that CAM create a subsidiary that would provide transfer agent services to the Funds using technology purchased from a First Data competitor.

CAM rejected Deloitte's recommendation. Instead, it renegotiated the terms of its contract with First Data.[4] CAM proposed that the Funds continue to pay the same transfer agent fees to First Data, with the exception that Smith Barney would assume the limited function of

---

[4] PFPC, Inc. acquired First Data in December 1999. For ease of reference, First Data and PFPC are referred to collectively as "First Data."

running a 14-person customer service call center at minimal cost. First Data would receive the same fees as before, but would rebate a substantial portion of the fee to Smith Barney.

Deloitte expressed doubts to CAM as to the legality of the arrangement, questioning, among other things, whether the anticipated savings belonged to the Funds as opposed to the investment adviser and whether the Fund Boards would ever approve such an arrangement. At that point, CAM changed course and created a transfer agent subsidiary called Citicorp Trust Banks ("CTB") which, in place of First Data, then contracted with the Funds to provide transfer agent services. At the same time, CTB contracted with First Data to provide most of the same transfer agent services it had previously provided but at a much lower rate. Because of this subcontract, CTB's role as a transfer agent was a circumscribed one; the company operated a 15-person call center. CTB memorialized its subcontract with First Data in a "side letter." The side letter allegedly guaranteed CAM millions of dollars in additional revenue, without providing commensurate benefit to the Funds. Despite the fact that First Data substantially reduced the rate it charged for transfer agent services, and despite the fact that CTB's circumscribed role was confined to operating the call center, CTB charged the Funds substantially more in transfer agent fees than it paid First Data. Thus, according to Local 649, CAM, through CTB, essentially pocketed money belonging to the Funds.

Local 649 further alleges that CAM concealed critical aspects of its scheme from the Funds' boards of directors, which were responsible for approving the investment adviser's fee. During presentations to the Funds' boards between March and June 1999, Senior Vice President Daidone recommended that the boards enter into the proposed contract with CTB but failed to

inform the boards about the details of the side letter. These presentations were accompanied by a memorandum, authored by Daidone, which represented that the goals of the new contract with CTB were to reduce fees and promote future growth. Daidone's efforts to persuade the Funds' boards to adopt the contract with CTB proved successful. Each of the boards approved his recommendation.

According to Local 649, CAM then concealed its scheme from investors. On May 26, 2000, a Smith Barney affiliate issued a prospectus, updating them about the state of the Funds and subsequently issued an amended prospectus on September 11, 2000, the first day of the Class Period. That amended prospectus and prospectuses that followed on April 24, 2001, March 29, 2002 and June 24, 2002 all disclosed, with varying levels of detail, the existence of the contract between the Funds and CTB. These prospectuses also disclosed the subcontract between CTB and First Data. CAM did not initially disclose in these prospectuses, however, that First Data continued to perform the same services it had previously performed at a substantially reduced rate. Nor did CAM disclose that the nominal transfer agent, CTB, would perform only minimal functions but would then pocket the difference between what it charged the Funds and what it paid First Data.

In September 2003, a whistleblower reported to the SEC about CAM's failure adequately to disclose the arrangement to the Fund Boards. Three months later, CAM issued written supplements to the Fund prospectuses disclosing the existence of the side letter, and disclosing that CAM had not informed the Funds' boards of the side letter at the time that they approved the transfer agent contracts.

In 2005, the SEC investigated Smith Barney and CGMI for violations of the Investment Advisers Act of 1940 alleging that they induced the Funds to enter into a contract that resulted in unnecessarily high expenses to the Funds and undisclosed profits to CAM. Specifically, according to the SEC, the cumulative effect of the scheme was to provide CTB with pretax revenues of approximately $100 million off set by total operating expenses of $10.5 million and to funnel to CAM and its affiliates approximately $17 million in additional revenue based on "revenue guarantee" arrangements in the side letter. In May 2005, the SEC settled with Smith Barney and CGMI, who agreed to pay more than $200 million in fines and disgorge the profits generated by the scheme. Based on these allegations, investors filed a series of civil suits in the Southern District of New York seeking damages for defendants' violations of, among other provisions, § 10(b) of the Securities Exchange Act of 1934, Rule 10b-5, and § 36(b) of the Investment Company Act of 1940. These suits were subsequently consolidated with Local 649 serving as lead plaintiff and filing the Amended Complaint that is the subject of this appeal.

In September 2007 the District Court granted Defendants' motion to dismiss the Complaint, holding that the mischaracterization of the fees paid to CTB as transfer agent fees was not a false material representation under § 10(b). The district court also dismissed Local 649's § 36(b) claims on the ground that they could only be brought derivatively on behalf of the Funds. The court granted Local 649 leave to replead its § 36(b) claims as derivative, rather than direct claims. After Plaintiff elected to stand on its complaint, the district court entered final judgment. This appeal followed.

**DISCUSSION**

We review a district court's dismissal of a complaint pursuant to Rule 12(b)(6) *de novo*. The court accepts all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor. In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *accord Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).

The materiality of a misleading statement or omission for § 10(b) purposes is a mixed question of law and fact, and a complaint may not be dismissed under Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quotation marks omitted).

**I.**

The district court dismissed Local 649's § 10(b) claims because it concluded that when an investment adviser discloses the total amount of fees paid by a fund for various services, neither the fees' allocation nor the transfer agent's profit margin is material. Finding that only the amount of fees is relevant to the price and value of the funds, the court reasoned that an investor who knows the amount of fees a fund pays can, when deciding to invest, compare the fees to those of its competitors. Because it was not disputed that appellees had disclosed the gross amount of the fees paid by the Funds, the court concluded that "Plaintiffs were in

8

possession of all material information; i.e., they knew the value of the Funds." The district court further reasoned that "it is the amount of fees, not their allocation or a transfer agent's profit margin, that is relevant to the price and value of the funds," and the gross amount of each of the fees was disclosed.

Section 10(b) of the Securities Exchange Act and Rule 10b-5 make it unlawful for any person:

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. To state a claim under these provisions, "[a] plaintiff must allege that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's conduct caused plaintiff injury." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 321 (2d Cir. 2002) (internal quotation marks and brackets omitted).

The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. *Cf. Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 205 (2d Cir. 1980); *Beecher v. Able*, 374 F. Supp. 341, 347 (S.D.N.Y. 1974) ("'[A] statement which is literally true, if susceptible to quite another interpretation by the reasonable investor . . . may properly . . . be considered a material misrepresentation.'") (quoting *SEC v. First Am. Bank & Trust Co.*, 481 F.2d 673, 678 (8th Cir. 1973). Some literally accurate

statements can, "through their context and manner of presentation, [become] devices which mislead investors." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). In light of these principles, we have little difficulty concluding that the defendants' disclosures concerning the transfer fee arrangements were inadequate.

## A. Materiality

To determine whether a misrepresentation is material, we look to whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (*quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *Acito v. IMCERA Group*, 47 F.3d 47, 52 (2d Cir. 1995). Put another way, "[a] fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock]." *Azrielli*

*v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir. 1994).

Local 649 contends that the defendants misrepresented the services that CTB performed because investors were not told: (1) that CTB would limit its role to operating a small call center; (2) that First Data would, in practice, provide the vast majority of transfer agent services; or (3) that First Data would charge only a fraction of the fees that would be drained from the Funds. Further, in the Fund prospectuses, defendants categorized the fees that CAM pocketed as "other fees," when in fact, they were far more akin to "management fees" a category that, under SEC rules, was required to be separately stated.

We agree with Local 649 that CAM's misrepresentations were material. A substantial likelihood exists that a reasonable investor would view them as significant alterations of the "total mix" of information made available. *Basic Inc.*, 485 U.S. at 232. First and foremost, what the Fund investors could not divine from the disclosures was that they were at the mercy of a faithless fiduciary. As the Supreme Court has admonished: "[t]he relationship between investment advisers and mutual funds is fraught with potential conflicts of interest." *Burks v. Lasker*, 441 U.S. 471, 481 (1979) (quoting *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 93 (1991) (observing "the potential conflicts of interest inherent in" mutual fund arrangements.) For a comprehensive analysis of this problem, see David F. Swensen, *Unconventional Success: A Fundamental Approach to Personal Investing* 220-269 (2005).

CAM, acting through investment adviser Smith Barney, owed a duty of "uncompromising fidelity" and "undivided loyalty" to the Funds' shareholders. *Galfand v. Chestnutt Corp.*, 545 F. 2d. 807, 809-11 (1976); *see also Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 535 n.11 (1984).

11

Any rational mutual fund investor would be highly leery of dealing with a fiduciary such as CAM and its affiliates who, in violation of the law, lined their pockets at the expense of investors whose interests they were obligated to protect. The district court's analysis did not engage this reality.

Under the circumstances alleged in the complaint, the defendants had an obligation to negotiate the best possible arrangement for the Funds. In addition, they were obligated to disclose candidly to shareholders the material features of the arrangements they crafted. *See generally Overton v. Todman & Co.*, 478 F.3d 479, 485 (2d Cir. 2007). These obligations required the defendants to make clear to both the Board and the Funds' shareholders that CAM was assuming nearly the full benefit of the discounts generated by First Data. We conclude that the facts that shareholders were being grossly overcharged for transfer agent services and that CAM was reaping the benefits were ones that would have "been viewed by the reasonable investor as having significantly altered the total mix of information made available. *TSC Indus.*, 426 U.S. at 449.

The SEC's disclosure rules support this analysis. In connection with the distribution of securities, a mutual fund is required to file with the SEC a registration statement and prospectus containing fee tables summarizing the expenses deducted from fund assets. *See* 15 U.S.C. §§ 80a-8, 80a-24, 80a-29; Form N-1A Registration Form for Open-end Management Investment Companies (2007), General Instructions to Item 3, http://www.sec.gov/about/forms/formn-1a.pdf (last visited Jan. 5, 2010). The prospectus is considered by the SEC to be the "most complete source of information about a fund" and serves as "a fund's primary disclosure document."

Registration Form Used by Open-End Management Investment Companies Securities Act, 63 Fed. Reg. 13,916, at 13,917-18 (Mar. 23, 1998).  For example, in the context of a typical open-end mutual fund, SEC Regulations require that the prospectus contain only "information that is necessary for an average or typical investor to make an investment decision," and "focus its contents on information that is essential to an investment in the fund." *Id*. at 13,918-19.  The fee tables within the prospectuses carry special significance  because they "reflect[] the Commission's strongly held belief in the importance of fees and expenses in a typical investor's decision to invest in a fund. The fee table is designed to help investors understand the costs of investing in a fund and to compare those costs with the costs of other funds." *Id.* at 13, 924.

The SEC requires investment advisers to distinguish management fees from "other" expenses in a fee table placed at the front of a prospectus.  *See, e.g.*, SEC Form N-1A, *supra*; 17 C.F.R. § 274.11A ("Form N-1A shall be used as the registration statement to be filed pursuant to Section 8(b) of the Investment Company Act of 1940 by open-end management investment companies. . .").  Specifically, the SEC requires mutual funds to break out and disclose separately three categories of fund expenses in the front of every fund prospectus: "Management Fees;" Distribution or "12b-1" fees; and "Other Expenses." *Id.*  The SEC defines "Management Fees as "investment advisory fees (including any fees based on the Fund's performance), *any other management fees payable to the investment adviser or its affiliates*, and *administrative fees payable to the investment adviser or its affiliates that are not included as 'Other Expenses.'"*  *Id.* (emphasis added).  Few facts would likely constitute more important ingredients in investors' "total mix" of information than the fact that, in violation of these disclosure requirements the

expenses categorized as transfer agent fees were not transfer agent fees at all and included kickbacks to CTB and ultimately, CAM.

The second requirement of the SEC that we find compelling relates to what an investment advisor must do when seeking approval for an increase in its fee. The advisor must issue, among other things, a "comparative fee table . . . if any of the fee categories in the fee table would be increased (i.e., Management Fees, 12b-1 Fees, Other Expenses) *regardless of whether total expenses would be increased*." Amendments to Proxy Rules for Registered Investment Corps., 59 Fed. Reg. 52,689, at 52,691 (Oct. 19, 1994) (codified at 17 C.F.R. pt. 200) (emphasis added). The importance of the accurate reporting of categories of fees in prospectuses is obvious: a "comparative" fee table is not useful to an investor if the information in the table is incomplete or otherwise misleading as, for example, where an advisor receives the same fee for substantially less work.

The conclusion that appellees' misrepresentations were material is further buoyed by § § 36(b) of the ICA. 15 U.S.C. § 80a-35(b). That provision imposes a fiduciary duty on investment advisers "with respect to the receipt of compensation for services, or of payments of a material nature," paid by mutual funds or their investors "to such investment adviser or any affiliated person of such investment adviser." *Id*. By imposing an express fiduciary duty with respect to "compensation for services" by investment advisers, without imposing a parallel fiduciary duty with regard to other expenses, Congress indicated that advisory fees are a particularly sensitive and important brand of fees or expenses.

Here, appellees categorized fees that it ultimately pocketed as "other fees" rather than

14

management fees. It did so under the guise of providing transfer agent services through CTB, despite CTB's greatly diminished role in providing such services. In light of the importance the SEC attaches to the proper categorization of fees generally, and the importance Congress has attached to management fees in particular, we hold that defendant's misrepresentations were material because there exists a substantial likelihood that a reasonable investor would consider it important that her fiduciary was, in essence, receiving kickbacks.

Appellees rely heavily on *Gartenberg v. Merrill Lynch Asset Management*, *Inc.*, in which we suggested that the amount of an advisory fee would rarely be material to investors, because "[t]he fund customer's shares of the advisory fee is usually too small a factor to lead him to invest in one fund rather than in another or to monitor adviser-manager's fees." 694 F.2d 923, 929 (2d Cir. 1982). This observation, however, is inapplicable to our present analysis. *Gartenberg* addressed plaintiffs' claims for breach of fiduciary duty in violation of § 36(b), not fraud in violation of § 10(b) or Rule 10b-5. That case did not involve application of the "total mix" materiality test that we apply here. *TSC Indus., Inc.*, 426 U.S. at 449.

*Gartenberg* also predated the SEC amendments that require separate categorization of management fees, distribution fees and other fees – amendments that highlight the importance of the accurate categorization of these expenses. *See* Amendments to Proxy Rules for Registered Investment Companies, 59 Fed. Reg. at 52,691 (establishing Item 22 fee schedule as a new reporting requirement). These amendments are entitled to significant weight because the SEC "has a technical staff, is able to hold public hearings, and can, thus, receive wide and expert input, and can specify forms of disclosure, if appropriate." *Resnik v. Swartz*, 303 F.3d 147, 154-55 (2d

Cir. 2002) (internal citation omitted). Further the SEC is equipped, as it did in 1994 in the disclosure context, to "propose rules for comment and [can] easily amend rules that do not work well in practice." *Id.* at 155.

B. Loss Causation

Appellees argue that Local 649's Exchange Act claims must be dismissed because Local 649 cannot establish loss causation. Under *Dura Pharm. Inc. v. Broudo*, "[i]n cases involving publicly traded securities and purchases or sales in public securities markets," a plaintiff must establish *reliance* on a material representation, which is "often referred to . . . as 'transaction causation.'" 544 U.S. 336, 341 (2005) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988)). In addition, a plaintiff must establish economic loss *and* "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342 (citations and emphasis omitted); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 106 (2d Cir. 2007). The appellees here present two distinct arguments as to why Local 649 has not established loss causation.

First, the appellees note that the SEC ordered them to disgorge "essentially all [transfer agent] profits" to the Funds, and Local 649's theory of loss is based upon the economic diminution in the Funds' net asset values due to the excessive transfer agent fees. According to appellees, $34 million has been distributed to the Funds, and the remaining amount has been paid to the Treasury Department in June 2005 and "will be turned over to the Funds once the settlement distribution plan is approved by the SEC." With CTB's share of those fees restored to

16

the Funds, there is no remaining compensable loss, appellees argue. However, because this case comes before us on a motion to dismiss, no factual record has yet been developed regarding the the status of the SEC-ordered restitution. As such, it is premature at this juncture to conclude that the SEC's ordered restitution fully compensates Local 649.

Second, the appellees argue that even if excessive fees caused a diminution in the value of the Funds, such a loss was dependent solely upon the aggregate amount of the fees paid by the Funds, which was fully disclosed. Therefore, this loss was not caused by additional, undisclosed facts regarding the nature of CTB's business or CTB's relationship with First Data. Relying on *Dura*, appellees contend that Local 649 alleges transaction causation, but that it does not properly allege loss causation.

We are convinced, however, that Local 649 adequately alleges loss causation. Local 649 alleges that the defendants' misrepresentations caused investors to make *and maintain* investments in Funds that were subject to excessive fees and expenses, and that the periodic deduction of those fees and expenses reduced the value of the investments over time. Put another way, Local 649 has alleged that the defendants' misrepresentations proximately resulted in the regular deduction of identifiable amounts that would not have been deducted had defendants conformed their conduct to what the law required. The defendants' losses were real ones because the deductions used to fund the transfer agent "fees" diminished for Local 649 (and other shareholders) money under management and, as a result, negatively and predictably impacted returns. *See* Swensen, *supra* at 224-27. Thus, Local 649's allegations satisfy the requirement, embraced in *Dura*, "that a plaintiff in such a case show not only that had he known the truth he

17

would not have acted but also that he suffered actual economic loss." *Id.* at 343–44.

## II.

Section 36(b) of the Investment Company Act provides that the SEC or a shareholder may bring suit "on behalf of such company" against investment advisers and their affiliates for breaches of fiduciary duty with respect to compensation or payments by investors. 15 U.S.C. § 80a-35(b).[5] The district court dismissed Local 649's § 36(b) claim after it determined that the claim must be pled derivatively on behalf of the Funds, with any damages going to the Funds, rather than directly to shareholders. "[A] derivative action allows a stockholder 'to step into the corporation's shoes and to seek in its right the restitution he could not demand in his own.'" *Daily Income Fund*, 464 U.S. at 528 (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548

---

[5]     Section 36(b) states, in relevant part:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, . . . to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, . . . for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company . . . to such investment adviser or person.

15 U.S.C. § 80a-35(b).

(1949)).

The complaint alleges that plaintiffs seek "monetary damages against all of the Defendants for all losses and damages suffered as a result of the wrongdoings alleged in this complaint, together with interest thereon." The complaint does not specify whether Local 649 – or the other plaintiffs in these consolidated cases – seek direct damages. The district court, however, concluded that the individual plaintiffs seek direct damages. And, that impression is confirmed by the plaintiffs' decision not to file an amended complaint when the district court granted leave to do so, and, more importantly, their contention that shareholders may file traditional direct actions under § 36(b).

Local 649 contends that § 36(b) claims may be pleaded directly, and that the district court erred in concluding otherwise. As support, Local 649 draws on upon language in *Daily Income Fund* addressing whether the demand requirement of Fed. R. Civ. P. 23.1[6] applies to § 36(b) claims even though § 36(b) itself forecloses claims by companies. The Court stated, "the term 'derivative action,' which defines the scope of Rule 23.1, has long been understood to apply only

---

[6]     Rule 23.1 states, in relevant part:

> (a) Prerequisites. This rule applies when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association.

Fed. R. Civ. P. 23.1(a).

to those actions in which the right claimed by the shareholder is one the corporation could *itself* have enforced in court." *Id.* at 529 (emphasis added). The Court went on to hold that Fed. R. Civ. P. 23.1, which covers "derivative" actions, does not apply to § 36(b) claims. Local 649 argues that if a § 36(b) claim is not "derivative" within the meaning of Rule 23.1, then it is not derivative at all, and shareholders may sue directly.

While Local 649's argument holds some facial appeal, a more nuanced inspection of *Daily Income Fund* indicates that it is limited to the context of Rule 23.1. In *Daily Income Fund,* the Court explained:

> The 'on behalf' language in § 36(b) indicates only that the right asserted by a shareholder suing under the statute is a 'right of the corporation' – a proposition confirmed by other aspects of the action: The fiduciary duty imposed on advisers by § 36(b) is owed to the company itself as well as its shareholders *and any recovery obtained in a § 36(b) action will go to the company rather than the plaintiff.* See S. Rep. No. 91-184, p. 6 (1970); § 36(b)(3). *In this respect, a § 36(b) action is undeniably "derivative" in the broad sense of that word.*

*Daily Income Fund*, 464 U.S. at 535 n.11 (emphasis added). Thus, *Daily Income Fund* did not hold that plaintiffs may – as Local 649 attempts to do here – press claims in which the recovery will go to them directly. The Court expressly said the opposite, in keeping with its characterization five years earlier that § 36(b) provides for "derivative suits charging breach of fiduciary duty with respect to adviser's fees." *Burks*, 441 U.S. at 484.

The context in which *Daily Income Fund* arose also supports this reading. The case was decided upon appeal from this Court's decision in *Fox v. Reich & Tang, Inc.*, 692 F.2d 250 (2d Cir. 1982). There, we held that a claim under § 36(b) was not subject to the demand requirement

of Rule 23.1 because that requirement "applies only when a corporation or association has failed to enforce a right which may properly be asserted by it," *id.* at 253 (internal quotation marks omitted), and § 36(b) did not give mutual funds (which are corporations) the right to bring suit themselves. *Id.* at 254-55, 261. Section 36(b) provides that "[a]n action may be brought under this subsection by the [SEC], or by a security holder of such registered investment company on behalf of such company." 15 U.S.C. § 80a-35(b). The appellee in *Fox* argued that the use of the phrase "on behalf of" indicated that the right of the shareholder to sue under § 36(b) is derivative, and that Rule 23.1 therefore applied as it applied to other derivative actions in federal courts. *Fox,* 692 F.2d at 255.

This Court rejected that view, holding that "the words 'on behalf of' do not create by implication a statutory right of the company itself to sue, from which the stockholders' right may be said to be 'derivative.'" *Id.* Instead, the Court clarified, those words "signify only that either party so entitled to bring an action under § 36(b) *must do so to seek return of excessive management fees to the company treasury and not to individual or governmental coffers*." *Id.* (emphasis added). We thus indicated that a § 36(b) action (1) was not "derivative" of an action the mutual fund could bring itself, and (2) must be brought in a representative capacity on behalf of the fund and with recovery going to the fund.

The Supreme Court affirmed. Noting that Rule 23.1 applied only "to those actions in which the right claimed by the shareholder is one the corporation could itself have enforced in court," *Daily Income Fund*, 464 U.S. at 529, the Court concluded that claims under § 36(b) were not subject to that Rule's demand requirement, because that provision allows actions only by

security holders or the Securities and Exchange Commission. *Id.* at 542. This reasoning does not undermine the view that § 36(b) only authorizes suits in which recovery goes to the coffers of the company, rather than a shareholder. "[W]hile section 36(b) claims are not derivative for purposes of Rule 23.1 . . ., they are derivative, in the general sense of the word, because they are asserted on behalf of all shareholders and result in no direct benefit to the individual plaintiff shareholders." *In re Dreyfus Mut. Funds Fee Litig.,* 428 F. Supp. 2d 357, 359 (W.D. Pa. 2006). This is particularly true given the Supreme Court's express statement to that effect. *See Daily Income Fund*, 464 U.S. at 535 n.11.

"The end result of [*Daily Income Fund* is] that, under § 36(b), a claimant brings a 'direct' suit in name only and a 'derivative' one with respect to the recovery of any damages." *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d 579, 596 (S.D.N.Y. 2006). Any other result would, at the least, spark significant tension with our previous statement that "Congress explicitly provided in § 36(b) of the ICA for a private right of derivative action for investors." *Olmsted v. Pruco Life Ins. Co. of N.J.*, 283 F.3d 429, 433 (2d Cir. 2002); *see also Burks*, 441 U.S. at 484. To the extent Local 649 seeks damages that inure to its own benefit and not to the Funds', that result is not permitted by § 36(b).

**CONCLUSION**

For the foregoing reasons, the judgment of the district court with respect to Local 649's claims under § 10(b) and Rule 10b-5 is VACATED and REMANDED, while the judgment with respect Local 649's § 36(b) claim is AFFIRMED.

22