17-3484-cv
*Singh v. Cigna Corp.*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2018

No. 17-3484-cv

MINOHOR SINGH,
Individually and On Behalf of All Others Similarly Situated,
*Lead Plaintiff-Appellant*,

v.

CIGNA CORPORATION, DAVID CORDANI, THOMAS A. MCCARTHY,
HERBERT A. FRITCH, RICHARD APPEL,
*Defendants-Appellees*.[*]

On Appeal from the United States District Court
for the District of Connecticut

ARGUED: OCTOBER 2, 2018
DECIDED: MARCH 5, 2019

___

[*] The Clerk of Court is directed to amend the caption as set out above.

Before:

CABRANES and SACK, *Circuit Judges,* and KOELTL, *District Judge.*[†]

———————

Lead Plaintiff-Appellant Minohor Singh, individually and on behalf of all other similarly situated, ("Plaintiffs") appeals from an October 2, 2017 judgment of the United States District Court for the District of Connecticut (Vanessa L. Bryant, *Judge*) dismissing this class action alleging violations of federal securities laws by Cigna Corporation ("Cigna") and certain of its officers (jointly, "Defendants"). Plaintiffs claim that certain of Defendants' statements were materially misleading, constituting fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5. The District Court determined that the alleged misstatements do not constitute fraud under the relevant legal standards and granted Defendants' motion to dismiss. We conclude that a reasonable investor would not rely on the challenged statements as representations of regulatory compliance. Accordingly, we affirm.

———————

DAVID J. GOLDSMITH (James W. Johnson,
Michael H. Rogers, James T. Christie, *on the*

———————

[†] Judge John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

*brief*) Labaton Sucharow LLP, New York, NY, *for Plaintiff-Appellant*.

ANDREW W. STERN (James O. Heyworth, Francesca E. Brody, *on the brief*) Sidley Austin LLP, New York, NY, *for Defendant-Appellee*.

---

JOSÉ A. CABRANES, *Circuit Judge*:

This case presents us with a creative attempt to recast corporate mismanagement as securities fraud. The attempt relies on a simple equation: first, point to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant regulatory violations; and *voila*, you have alleged a prima facie case of securities fraud! The problem with this equation, however, is that such generic statements do not invite reasonable reliance. They are not, therefore, *materially* misleading, and so cannot form the basis of a fraud case.

Lead-Plaintiff Minohor Singh, on behalf of himself and other shareholders, ("Plaintiffs") appeals from an October 2, 2017 judgment of the United States District Court for the District of Connecticut (Vanessa L. Bryant, *Judge*) dismissing this class action alleging violations of federal securities laws by Cigna Corporation ("Cigna") and certain of its officers (jointly, "Defendants"). Plaintiffs claim that certain of Defendants' statements were materially misleading,

3

constituting fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5. The District Court determined that the alleged misstatements do not constitute fraud under the relevant legal standards and granted Defendants' motion to dismiss. We conclude that a reasonable investor would not rely on the challenged statements as representations of regulatory compliance. Accordingly, we affirm.

## I.      BACKGROUND

*Cigna's Acquisition of Healthspring:*

In early 2012, Cigna, a multi-national health services organization incorporated in Delaware, purchased HealthSpring Inc., a successful regional Medicare insurer based in Nashville, Tennessee, for $3.8 billion.[1] The goal of the acquisition was to bring Cigna into the fast-growing Medicare insurance market, complementing Cigna's commercial health business with Medicare offerings as current Cigna customers aged. Initially, the acquisition appeared to produce benefits: within a year, HealthSpring had become Cigna's largest source of revenue.

*Defendants' Statements Concerning Regulatory Compliance:*

Cigna's leadership was aware that HealthSpring's extensive Medicare business subjected the company to significant regulatory

---

[1] Unless otherwise noted, the factual background is drawn from the Second Amended Complaint, J.A. 74-160, and the District Court Memorandum of Decision, SPA 1-18.

responsibilities. Indeed, during the acquisition and over the next two years, Cigna and its officers issued several public statements concerning Cigna's commitment to regulatory compliance. As relevant here, these statements include the following:

*First*, on February 27, 2014, Cigna filed its 2013 Form 10-K. In a section titled "Regulation," Cigna claimed to have "established policies and procedures to comply with applicable requirements."[2] Similarly, in a section titled "Medicare Regulations," Cigna asserted that it "expect[s] to continue to allocate significant resources" to various compliance efforts.[3] Importantly, the same paragraph also cautioned that Cigna's Medicare business was "subject to . . . numerous and complex regulations and requirements that are frequently modified and subject to administrative discretion."[4]

*Second*, in December 2014, Cigna published a pamphlet titled "Code of Ethics and Principles of Conduct." The pamphlet includes statements from senior Cigna executives affirming the importance of compliance and integrity. In particular, the pamphlet stated that "it's so important for every employee . . . to handle, maintain, and report on [Cigna's financial] information in compliance with all laws and regulations," and that "we have a responsibility to act with integrity

---

[2] J.A. 215.

[3] *Id.* at 218.

[4] *Id.*

5

in all we do, including any and all dealings with government officials."[5]

*Third*, on February 26, 2015, Cigna filed its 2014 Form 10-K. Like the 2013 Form 10-K, this form states that Cigna "expect[s] to continue to allocate significant resources" to compliance.[6] The 2014 form, however, omits the claim that Cigna has "established policies and procedures to comply with applicable requirements." Additionally, it contains an expanded discussion of the difficulty of compliance given the regulatory uncertainty surrounding legislation and implementation of national healthcare reform.[7]

*Cigna's Regulatory Compliance Challenges:*

During the period these statements were released, however, Cigna's Medicare operations experienced a series of compliance failures.

Prior to its acquisition by Cigna, HealthSpring had never been sanctioned or cited for non-compliance by the Centers for Medicare and Medicaid Services ("CMS"), the regulatory body that oversees Medicare services. From April 2014 through December 2015, however, Cigna received more than 75 CMS notices for a variety of compliance infractions. Although Plaintiffs do not specify the severity of each

---

[5] *Id*. at 411, 417.

[6] *Id.* at 200.

[7] *Id.* at 196-97.

6

notice, such notices vary in seriousness from a Notice of Non-Compliance" (which CMS describes as its "[m]ildest type of letter . . . not contain[ing] specific language regarding further compliance escalation or other consequences should the behavior/non-compliance continue") to the more severe "Corrective Action Plan" (which "indicates continuing and/or severe, systemic problems").[8]

In October 2015, CMS conducted an extensive audit of Cigna's Medicare operations. On January 21, 2016, CMS informed Cigna by letter that CMS auditors had concluded that "Cigna substantially failed to comply with CMS requirements" regarding coverage determinations, appeals, benefits administration, compliance program effectiveness and similar matters.[9] The letter also notes that "Cigna has had a longstanding history of non-compliance with CMS requirements" as demonstrated by the receipt of numerous prior notices.[10] CMS also informed Cigna that it would impose intermediate sanctions suspending enrollment of Medicare beneficiaries effective at 11:59 p.m. that night. The next day, Cigna filed a Form 8-K disclosing its receipt of the CMS letter and the accompanying sanctions.

---

[8] *Id.* at 349.

[9] *Id.* at 166.

[10] *Id.*

*Cigna's Stock Price Drops and Plaintiffs File Suit:*

Over the next four days, Cigna's stock price fell substantially, from $140.13 to $135.85.[11]

On February 4, 2016, Cigna investor Jyotindra Patel filed a putative class action against Cigna on behalf of all individuals who had acquired Cigna securities between February 27, 2014 (the date of the 2013 Form 10-K) and January 21, 2016 (the date of the CMS letter and sanction).[12] On April 4, 2016, Plaintiff-Appellant Minohor Singh moved for appointment as lead plaintiff, arguing that he (rather than Patel) was the "most adequate" representative due to his "substantial financial interest" and retention of a "nationally recognized securities class action litigation firm."[13] On May 17, 2016 the District Court granted Singh's motion.[14]

On July 29, 2016, Cigna announced that it had already spent nearly $30 million to remedy the compliance violations, but that it may "not be able to address matters arising from the [CMS Sanctions]

---

[11] *Id.* at 87.

[12] *See Singh v. Cigna Corp.*, No. 3:16-cv-182 (VLB), Dkt. No. 1 at 2.

[13] *See id.*, Dkt. No. 27-1 at 1-2.

[14] *See id.*, Dkt. No. 34 at 1.

Notice in a timely and satisfactory manner."[15] At the close of trading on August 2, 2016, Cigna's stock price had fallen to $124.13 per share.

On August 1, 2016 Plaintiffs (now represented by Lead Plaintiff Singh) filed an amended complaint,[16] and on November 30, 2016, Plaintiffs filed a second amended complaint, extending the class period to August 2, 2016.[17] On February 13, 2017, Defendants filed a motion to dismiss, and on October 2, 2017, the District Court entered judgement granting the motion.  This appeal followed.

## II. DISCUSSION

"We review the grant of a motion to dismiss *de novo*, accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor."[18] To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.,* a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4)

---

[15] J.A. 88. Although the complaint does not provide a citation, the above quotation appears to be drawn from Cigna's 10-Q.  *See* Cigna Second Quarter Form 10-Q (July 29, 2016), *available at* https://www.cigna.com/about-us/investors/quarterly-reports-and-sec-filings/. *See also, Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("courts ordinarily examine . . . documents incorporated into the complaint by reference").

[16] *See Singh v. Cigna Corp.*, No. 3:16-cv-182 (VLB), Dkt. No. 40.

[17] *See id.*, Dkt. No. 57.

[18] *Fink v. Time Warner Cable*, 714 F.3d 739, 740–41 (2d Cir. 2013).

reliance . . . ; (5) economic loss; and (6) loss causation."[19] Plaintiffs must allege those facts that give rise to an inference of scienter "with particularity."[20]

Here, the District Court dismissed the second amended complaint on the grounds that Plaintiffs failed to sufficiently allege both materially false statements and scienter. On appeal, Plaintiffs contest both holdings. Because we agree with the District Court regarding the absence of a material, false statement, we need not reach the issue of scienter.

An alleged misrepresentation is material if "there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock."[21] Such a statement must, in the view of a reasonable investor, have "significantly altered the 'total mix' of information made available."[22] The statement must also be "mislead[ing]," evaluated not only by "literal truth," but by "context and manner of presentation."[23]

---

[19] *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (internal quotation marks and brackets omitted).

[20] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

[21] *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010) (internal quotation marks and brackets omitted)

[22] *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)) (internal quotation mark omitted).

[23] *Operating Local 649*, 595 F.3d at 92 (brackets omitted).

On appeal, Plaintiffs highlight the three groups of statements discussed above, *i.e.*, the 2013 and 2014 Form 10-K statements and the 2014 Code of Ethics statements. Plaintiffs' argument that these statements are materially misleading rests on two premises: (1) that a reasonable stockholder would rely on these statements as representations of satisfactory legal compliance by Cigna; and (2) that when the statements were made, Cigna was not, in fact, legally compliant. We reject the first claim. A reasonable stockholder would not "consider [these statements] important in deciding whether to buy or sell shares of stock."[24] They cannot, therefore, constitute "material misstatements."

Like the District Court, we think that the statements in Cigna's Code of Ethics are a textbook example of "puffery." We have observed that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them."[25] The Code of Ethics statements, which amount to general declarations about the importance of acting lawfully and with integrity, fall squarely within this category.

We similarly think that a reasonable investor would not rely on the 2013 and 2014 Form 10-K statements as representations of

[24] *Id.* at 92-93 (internal quotation marks and brackets omitted).

[25] *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (internal quotation marks omitted).

satisfactory compliance. In the past, when we have found that descriptions of compliance efforts amounted to actionable assurances of actual compliance, the descriptions of such efforts were far more detailed.[26] For example, in *Meyer v. Jinkosolar*, the case on which Plaintiffs principally rely, we emphasized that the company described its compliance mechanisms in confident detail, including references to 24-hour monitoring teams, specific compliance equipment, and its clean compliance record. We illustrated that detail with a lengthy quotation from the company's prospectus:

> We have installed pollution abatement equipment at our facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal, and we treat the waste water, gaseous and liquid waste and other industrial waste produced during the manufacturing process before discharge. We also maintain environmental teams at each of our manufacturing facilities to monitor waste treatment and ensure that these waste emissions comply with People's Republic of China environmental standards. Our environmental teams are on duty 24 hours. We are required to comply with all PRC national and local environmental protection laws and regulations and our operations are subject to periodic inspection by national and local environmental protection authorities. PRC national and local environmental laws and regulations impose fees for the discharge of waste materials above prescribed levels, require the payment of fines for serious violations and provide that the relevant authorities may at their own discretion close or suspend the operation of any facility that fails to comply with

---

[26] *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014).

12

orders requiring it to cease or remedy operations causing environmental damage. As of December 31, 2009, no such penalties had been imposed on us.[27]

Such detailed descriptions stand in sharp contrast to Cigna's simple and generic assertions about having "policies and procedures" and allocating "significant resources."

Moreover, each of Cigna's statements was framed by acknowledgements of the complexity and numerosity of applicable regulations.[28] Such framing suggests caution (rather than confidence) regarding the extent of Cigna's compliance. Similarly, Cigna's assertion that it "expect[s] to continue to allocate *significant resources*"[29] to regulatory compliance suggests a company actively working to improve its compliance efforts, rather than one expressing confidence in their complete (or even substantial) effectiveness. If anything, these statements seem to reflect Cigna's uncertainty as to the very possibility of maintaining adequate compliance mechanism in light of complex and shifting government regulations.[30]

---

[27] *Id*. at 247-48 (emphasis and brackets omitted).

[28] J.A. 196-97, 214.

[29] *Id*. at 200, 218 (emphasis added).

[30] *See id.* at 197. Variations between the 2013 and 2014 10-K forms, particularly the omission in 2014 of Cigna's previous statement that it had "established policies and procedures," do not change our analysis. First, this statement, like the rest of the of the statements at issue, was couched in tentative terms. Moreover, the totality of the "Regulation" sections in the 2013 and 2014 forms suggests that the variations in language between 2013 and 2014 are likely the

13

**III. CONCLUSION**

Because the challenged statements are tentative and generic, and because they emphasize the complex, evolving regulatory environment that Cigna faced, we conclude that Plaintiffs have failed to plausibly allege that a reasonable investor would view these statements "as having significantly altered the total mix of information made available."[31] These statements are not, therefore, materially misleading.[32]

The October 2, 2017 judgment of the District Court is therefore **AFFIRMED**.

---

result of increased concern over the unsettled regulatory environment, including legal challenges to the formidably complex Affordable Care Act, *see generally King v. Burwell*, 135 S. Ct. 2480, 2492 (2015), and changes and delays in its implementation.

[31] *ECA,* 553 F.3d at 197 (internal quotation marks omitted).

[32] We also briefly address Plaintiffs' argument that "notwithstanding the automatic stay of discovery under the PSLRA," the District Court "had the misimpression that Plaintiffs had been receiving the benefit of formal discovery." Reply Br. Appellant at 26. A review of the record indicates that Plaintiffs are correct on this point. In its September 28, 2017 opinion, the District Court repeatedly asserts that Plaintiffs conducted extensive discovery. *Singh v. Cigna Corp.*, 277 F. Supp. 3d 291, 325 (D. Conn. 2017). However, the District Court's misimpression on this issue had no bearing on its decision to dismiss (nor do Plaintiffs so suggest). And while this misimpression might have some bearing on the District Court's decision to deny Plaintiffs leave to amend, *see id.* at 326, Plaintiffs failed to challenge that decision on appeal. As "[i]ssues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal," *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998), we decline to review the District Court's denial of further leave to amend the complaint.