20-652
*In re: Liberty Tax, Inc. Sec. Litig.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 30th day of September, two thousand twenty.

PRESENT:
>JON O. NEWMAN,
>REENA RAGGI,
>JOSEPH F. BIANCO,
>>*Circuit Judges.*

_____

In Re: Liberty Tax, Inc. Securities Litigation.

No. 20-652

_____

IBEW LOCAL 98 PENSION FUND,

>*Lead Plaintiff-Movant-Appellant*,

PATRICK BELAND, individually and on behalf of
all others similarly situated,

>*Plaintiff*,

>v.

LIBERTY TAX, INC., JOHN T. HEWITT,
KATHLEEN E. DONOVAN,

>*Defendants-Appellees*,

EDWARD L. BRUNOT,

         *Defendant*.

---

FOR LEAD PLAINTIFF-MOVANT-APPELLANT
IBEW LOCAL 98 PENSION FUND:

    STEVEN J. TOLL (Christina Donato Saler, Philadelphia, PA, *on the brief*), Cohen Milstein Sellers & Toll PLLC, Washington, DC.

FOR DEFENDANT-APPELLEE LIBERTY
TAX, INC.:

    TARIQ MUNDIYA (Jeffrey B. Korn, Zeh S. Ekono, *on the brief*), Willkie Farr & Gallagher LLP, New York, NY.

FOR DEFENDANT-APPELLEE JOHN T.
HEWITT:

    Harris N. Cogan, Blank Rome LLP, New York, NY.

FOR DEFENDANT-APPELLEE
KATHLEEN E. DONOVAN:

    Robert A. Fumerton (Christopher R. Fredmonski, New York, NY; Edward B. Micheletti, Wilmington, DE; *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Lead Plaintiff-Movant-Appellant IBEW Local 98 Pension Fund ("the Fund") appeals from a January 21, 2020 judgment granting Defendants-Appellees' motion to dismiss the Fund's

amended complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

## I. Background

In this class action pursuant to § 10(b) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, the Fund alleges that Defendants-Appellees Liberty Tax, Inc., John T. Hewitt, and Kathleen E. Donovan (collectively, "Liberty Tax"), made false and misleading statements and omissions of material facts regarding Hewitt's "abuse of authority, sexual impropriety at work, and diversion of company resources to his own pocket." Appellant Br. at 2.[1]

The district court dismissed the Fund's amended complaint for failure to adequately allege material misrepresentations and loss causation. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). On appeal, the Fund limits its challenge to allegedly misleading statements in a December 8, 2016 quarterly earnings call and a September 6, 2017 press release. With respect to the earnings call, the Fund asserts that Hewitt's statement about the success of Liberty Tax's compliance task force was materially false because the task force had failed to identify Hewitt's misconduct and remove him from his position. Regarding the press release, the Fund alleges that Liberty Tax misrepresented Hewitt's eventual termination as part of a "deliberate succession planning process" when his termination was actually due to misconduct. Joint App'x at 74. The Fund further alleges that Liberty Tax concealed from investors Hewitt's continued control of the Company after his termination.

---

[1] Hewitt founded Liberty Tax and was its Chief Executive Officer and Chairman of the Board of Directors, while Donovan was its Chief Financial Officer. The Fund does not charge Donovan with making any misstatements. Rather, it contends that Donovan knew of Hewitt's misconduct and was complicit in keeping it concealed.

## II. Discussion

We review a Rule 12(b)(6) dismissal *de novo*. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012). To survive such dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In securities cases, courts are permitted to consider "in addition to the complaint, and written instruments attached, statements incorporated by reference, and public disclosure documents filed with the SEC." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019).

Under § 10(b) and Rule 10b-5, a plaintiff must plausibly plead "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation." *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (quoting *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013)). As relevant here, "[t]he materiality of a misstatement depends on whether 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act],'" *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)), *i.e.*, whether the misrepresentation "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," *Basic Inc.*, 485 U.S. at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Securities fraud complaints are also subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Together, they require a complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, . . .

4

(4) explain why the statements were fraudulent," *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993), and (5) "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention 'to deceive, manipulate, or defraud,'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)).

On *de novo* review, we agree with the district court that the challenged earnings call statement was inactionable puffery and the statements at issue in the press release were not materially misleading. We further conclude that, based upon the dismissal of the Fund's § 10(b) claim, the district court properly dismissed the § 20(a) claim. Finally, given the grounds for dismissal and the absence of any showing that the legal defects could be cured by additional pleadings, the district court did not abuse its discretion in denying the Fund leave to amend.

### A. The December 8, 2016 Earnings Call Statement

In the December 8, 2016 quarterly earnings call, Hewitt made the following statement: "Our compliance task force was very successful in analyzing, reviewing and evaluating the work of our compliance department and taking appropriate action to ensure that the standards of the Liberty brand are upheld and that those who do not uphold Liberty standards are exited from the Liberty system." Joint App'x at 64. The Fund claims this statement was false because the fact that Liberty Tax had to hire a law firm to investigate Hewitt's misconduct belies his assertion that the task force was "very successful." Joint App'x at 64.

As a threshold matter, we note that the Fund failed to allege that this task force was created to root out misconduct generally, rather than fraud at franchisee locations specifically. Although the Fund asserts that creation of the compliance task force stemmed from a "remediation plan [that] consisted of modifications and improvements to [Liberty Tax's] internal controls in the areas

5

of staffing, policies and procedures, and training," Joint App'x at 46-47, the remediation plan was put in place two years prior to creation of the task force. Moreover, the documents incorporated by reference in the amended complaint convey that the task force was focused on fraud occurring at franchisee locations.[2] The Fund's attempts to expand the articulated mandate of the task force are not supported by allegations in the amended complaint or incorporated documents.

In any event, we agree with the district court that this statement was inactionable puffery on which no reasonable investor would rely in making investment decisions. *See Singh*, 918 F.3d at 61 ("[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them." (quotation marks omitted)); *see also ECA, Local 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 206 (holding that statements that the defendant "'set the standard' for 'integrity' and that it would 'continue to reposition and strengthen [its] franchises with a focus on financial discipline'" were nonactionable puffery given their generality (citations omitted)).

For instance, the statement references analyzing, reviewing, and evaluating the work of the compliance program, without describing what was analyzed, reviewed, or evaluated, much less

---

[2] For example, Liberty Tax's June 2016 10-K form, on which the Fund relies, reads as follows:

> We also use a variety of means in an attempt to identify potential compliance issues and require *franchisees to address any concerns*, including the creation of a Compliance Task Force to examine and prevent non-compliance, fraud and other misconduct among our franchisees and employees.

June 29, 2016 10-K; Joint App'x at 60 (emphasis added). Similarly, although the Fund points to a statement that Hewitt made about prevention of fraud during a quarterly earnings call held on March 4, 2016, that statement also makes reference to potential improper franchise activity. *See* Joint App'x at 152 ("Prevention of fraud remains a fundamental goal of our company, and so we take seriously recent news concerning potentially inappropriate activity in a *small number of franchise offices*." (emphasis added)). Moreover, Liberty Tax notes that Hewitt used the words "franchise" or "franchisee" sixteen times in the December 8, 2016 earnings call statement. Appellees Br. at 27.

6

when, or how, this work was done. As for the statement that individuals who do not uphold Liberty Tax's "standards" would be "exited from the Liberty system," Joint App'x at 64, this provides no "qualitative assurances and affirmative guarantees regarding the company's compliance with applicable laws and . . . specific steps it had taken to achieve particular results," *see In re UBS AG Sec. Litig.*, No. 07 CIV. 11225 RJS, 2012 WL 4471265, at *36 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). In sum, no reasonable investor would view this statement as meaningfully altering the mix of available information about Liberty Tax.

In urging otherwise, the Fund argues that Hewitt's statement was knowingly false because he was aware that the task force had not succeeded in uncovering his own misconduct or procuring his "exit" from the Company. Joint App'x at 64. However, even assuming *arguendo* that such misconduct was in the task force's purview, the Fund's "claim that these statements were knowingly and verifiably false when made does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 183.

We do not suggest that "statements about a company's reputation for integrity or ethical conduct can never give rise to a securities violation." *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir. 2016) (recognizing that "a company's specific statements that emphasize its reputation for integrity or ethical conduct as central to its financial condition or that are clearly designed to distinguish the company from other specified companies in the same industry" can, in some circumstances, violate securities laws). We conclude, only, that the alleged statement in this case lacks the specificity required to elevate it beyond mere puffery to an actionable, material misrepresentation. Accordingly, the district court correctly concluded that this earnings call

7

statement could not form the basis of a § 10(b) claim.

**B. September 6, 2017 Press Release**

The September 6, 2017 press release stated in full:

Virginia Beach, Va. (September 6, 2017) – Liberty Tax, Inc. (NASDAQ:TAX) (the "Company"), the parent company of Liberty Tax Service, announced that John T. Hewitt, the Company's Chief Executive Officer and Chairman, was terminated yesterday by the Company's Board of Directors (the "Board"), effective immediately. Mr. Hewitt, who is the sole holder of the Company's Class B common stock ("Class B Shares"), currently remains on the Board. The Company had engaged in a deliberate succession planning process, which resulted in Ed Brunot joining the Company as Chief Operating Officer as an interim step before assuming the role of CEO. The Company is currently finalizing its succession plans, however, the Board has determined that it is in the Company's best interests to terminate Mr. Hewitt at this time. The Company intends to announce the new CEO appointment in the coming days. The Company has been in negotiations to enter into agreements for Mr. Hewitt's separation and the repurchase of his Class B Shares, which permit him to appoint a majority of the Board. No such agreements have been reached, and whether the Company will enter into such agreements with Mr. Hewitt remains uncertain at this time.

Sept. 5, 2017 8-K; Joint App'x at 74, 83-84.

The Fund contends that this was materially misleading in two respects. First, it did not disclose that the true reason for Hewitt's termination was misconduct as revealed by a law firm's investigation, which concluded that Liberty Tax had a good faith basis to fire Hewitt for cause. The law, however, does not require that investors be given a reason for terminating corporate officers. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts."). To avoid this conclusion, the Fund maintains that the press release gave investors the misimpression that Hewitt's departure was pursuant to a "deliberate succession planning process." It argues that the truth about Hewitt's termination was not revealed to investors until the *Virginian-Pilot* reported on the law firm's

8

investigation on November 9, 2017, and in subsequent disclosures.  Second, the Fund alleges that the press release failed to reveal the extent to which Hewitt would retain control of the Company after his termination.  On *de novo* review, we agree with the district court that the amended complaint fails to allege material misrepresentations in the press release to support a § 10(b) claim.

First, the press release cannot reasonably be read to suggest that the "deliberate succession planning process" was the reason for Hewitt's termination.  The statement explained that Liberty Tax had engaged in succession planning in hiring Edward Brunot, not in firing Hewitt.  Indeed, the statement reported that even though the succession plan was not yet finalized, it was in Liberty Tax's "best interests" to terminate Hewitt immediately.  Joint App'x at 74.  A reasonable investor would understand such a statement to signal termination outside the plan, not pursuant thereto.

With respect to the Fund's second argument, the press release made the possibility of Hewitt's future involvement clear.  Specifically, it disclosed that (1) Hewitt controlled a majority of Class B stock, giving him the power "to appoint a majority of the Board," on which he himself would continue to serve, and that (2) while the Company was negotiating to repurchase Hewitt's shares, "[n]o such agreements have been reached," and whether they would be reached "remains uncertain at this time."  Sept. 5, 2017 8-K; Joint App'x at 84.  The amended complaint does not allege that, at the time of the press release, the status of the repurchase negotiations somehow rendered this statement false.

Insofar as the Fund maintains that Liberty Tax had a duty to update investors when Hewitt rejected its stock-repurchase proposal on September 28, 2017, we disagree.  Because the September 6, 2017 press release did not provide "affirmative 'false assurances,'" *Kleinman*, 706 F.3d at 156, or guarantee that Hewitt would sell his shares, it "lack[ed] the sort of definite positive projections that might require later correction," *In re Time Warner Inc. Secs. Litig.*, 9 F.3d at 267

9

(holding statements regarding negotiations were not materially misleading when "[n]o identified defendant stated that he thought deals would be struck by a certain date, or even that it was likely that deals would be struck at all").

Finally, to the extent the Fund claims that Liberty Tax did not reveal how Hewitt would maintain day-to-day control, the amended complaint does not sufficiently allege how the lack of such detail rendered the press release statements materially misleading. For example, the amended complaint asserts that "Hewitt's removal and election of directors demonstrated that despite being ousted as CEO, *he was going to attempt* to maintain control of the Company through the Board." Joint App'x at 41 (emphasis added). But an allegation about such an attempt – when the press release had already made clear that Hewitt retained the ability to appoint a majority of the Board – is insufficient to constitute a material misrepresentation.[3] In short, allegations that Hewitt might attempt to retain control, in the wake of a press release that already disclosed his ongoing control through his ownership of the Class B shares and the uncertainty of Company repurchase efforts, do not convert the press release into a material misrepresentation.[4] Although we recognize that

---

[3] The same conclusion obtains with even more force to similar statements reporting attempts to control made well after the press release issued. *See* Joint App'x at 85-86 (quoting resignation letter from public accounting firm KPMG that "Mr. Hewitt *may have* continued to interact with franchisees and area developers of the Company" (emphasis added)); Joint App'x at 89-90 (quoting news report that recent developments at Liberty Tax "*appear*[] to be a continuation of the control that Chairman John Hewitt refuses to relinquish despite his firing as CEO" (emphasis added)).

[4] The amended complaint also refers to a Board member's resignation letter in which he stated that, in addition to appointing individuals to the Board, Hewitt also terminated Brunot, who was hired as the replacement CEO; terminated the short-term consulting agreement with defendant Donovan; appointed an ally, Nicole Ossenfort, as CEO, who indicated in an email that Hewitt would "act in an advisory role" for her; and terminated the contract with the Company's law firm. Joint App'x at 91. There are no allegations in the amended complaint, however, that these actions took place prior to Liberty Tax's issuance of the press release, such that they could render the September 6, 2017 press release contemporaneously false. Indeed, the amended complaint

10

statements of literal truth "can become, through their context and manner of presentation, devices which mislead investors," *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990), that is not the case here as is evident from comparing the allegations in the amended complaint to the substance of the press release.

In sum, the amended complaint did not sufficiently allege material misrepresentations allowing the § 10(b) claim to survive a motion to dismiss.[5]  Moreover, because the amended complaint failed to set forth a primary violation of the securities laws, the district court correctly dismissed the Fund's claim of secondary liability under § 20(a).  *See In re Scholastic Corp. Securities Litig.*, 252 F.3d 63, 78 (2d Cir. 2001).

**C. Leave to Amend**

Finally, the Fund appeals the failure to afford it an opportunity to amend its complaint, a claim we review only for abuse of discretion.  *Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45, 49 (2d Cir. 1999).  Although leave to amend should be freely given when justice so requires, Fed. R. Civ. P. 15(a)(2), denial is warranted when amendment would be futile, *see Foman v. Davis*, 371 U.S. 178, 182 (1962).  Here, nothing in the record suggests that another complaint could remedy the legal deficiencies set forth above.  *See Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) ("[A]n amendment is not warranted [a]bsent some indication as to what appellants might add to their complaint in order to make it viable." (quotation marks omitted)).

---

specifically alleges that all of these actions were proposed by Hewitt and passed by the Board at its February 19, 2018 meeting.  Moreover, in its February 19, 2018 8-K filing, Liberty Tax disclosed these developments, and reiterated that Hewitt had the power to elect a majority of the members to the Board given his ownership of all the Class B shares.

[5] Although the district court separately held that the Fund failed to demonstrate loss causation, we need not reach that argument given our conclusion that the statements at issue did not constitute material misrepresentations.

11

Accordingly, the district court did not abuse its discretion in failing to provide the Fund with leave to amend.

* * *

We have considered the Fund's remaining arguments and conclude that they are without merit.  For the foregoing reasons, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court