20-2746-cv
IWA Forest Industry Pension Plan v. Textron Inc.

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2020

(Argued: June 1, 2021          Decided: September 17, 2021)

Docket No. 20-2746-cv

———————————————————

IWA FOREST INDUSTRY PENSION PLAN,

*Plaintiff-Appellant*,

v.

TEXTRON INC., SCOTT C. DONNELLY, FRANK T. CONNOR,

*Defendants-Appellees*.*

———————————————————

Before:

POOLER and LOHIER, *Circuit Judges*, and KAPLAN, *District Judge*.**

Shareholders filed a putative securities fraud class action against a manufacturer of aircraft and recreational vehicles and two of its executives, alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The shareholders claimed that the company made four sets of material misstatements, including misstatements regarding a recently acquired company's excess inventory levels. The United States District Court for the Southern District of New York (Cote, J.) dismissed the action for failure to allege any actionable misstatements. The shareholders appealed. We **VACATE** only as to the inventory-related statements and

---

* The Clerk of Court is directed to amend the caption as set forth above.

** Judge Lewis A. Kaplan, of the United States District Court for the Southern District of New York, sitting by designation.

**REMAND** to the District Court for further proceedings consistent with this opinion. We **AFFIRM** the District Court's ruling as to the other categories of statements.

Judge Kaplan dissents in part in a separate opinion.

FREDERIC S. FOX (Melinda D. Campbell, *on the brief*), Kaplan Fox & Kilsheimer LLP, New York, NY *for Plaintiff-Appellant* IWA Forest Industry Pension Plan.

SANDRA C. GOLDSTEIN (Stefan H. Atkinson, Kevin M. Neylan, Jr., *on the brief*), Kirkland & Ellis LLP, New York, NY *for Defendants-Appellees* Textron Inc., Scott C. Donnelly, and Frank T. Connor.

LOHIER, *Circuit Judge*:

IWA Forest Industry Pension Plan ("IWA") appeals from the July 20, 2020 judgment of the United States District Court for the Southern District of New York (Cote, J.) dismissing its putative class action, which alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5. In March 2017 Textron Inc. acquired Arctic Cat Inc., a manufacturer of snowmobiles and off-road dirt vehicles. In a second amended complaint, IWA alleges that Textron and its top executives—Scott C. Donnelly (Textron's Chairman and Chief Executive Officer) and Frank T. Connor (Textron's Chief Financial Officer)—made four sets of material misstatements during the class period between January and December 2018 relating to Arctic Cat's (1) inventory levels, (2) integration into

2

Textron's Specialized Vehicles business, (3) performance and prospects, and (4) possibility of a goodwill impairment charge. The District Court dismissed the complaint in its entirety for failure to allege an actionable misstatement, and IWA timely appealed.

For the reasons set forth below, we **VACATE** the District Court's judgment as to the inventory statements and **REMAND** for further proceedings. We **AFFIRM** the District Court's decision as to the remainder of the statements alleged in the complaint.

**BACKGROUND**

I

Textron is a publicly traded corporation that makes and sells aircraft, aerospace and defense products, and recreational vehicles. The company has five operational segments: Textron Aviation, Bell Helicopter, Industrial, Textron Systems, and Finance. At issue in this case is the Industrial segment, which includes the Textron Specialized Vehicles business.

In January 2017 Textron announced that it had reached a deal to acquire Arctic Cat, a manufacturer of snowmobiles and off-road dirt vehicles. Arctic Cat marketed and sold these products largely through a network of

3

approximately 800 independent dealers. At the time, Textron's CEO, Donnelly, openly acknowledged that Arctic Cat had "inventory issues." Specifically, over the preceding few years, inventory had "built up in the [sales] channel," and the excess inventory that remained from prior model years (model years 2016 and older) was weighing on current sales of new vehicles (model year 2017). App'x 30.

The acquisition closed in March 2017, and Textron began to integrate Arctic Cat into its Specialized Vehicles business. The next month Donnelly explained on an earnings call that "the challenge that we have" with Arctic Cat "was they frankly . . . have too much inventory." App'x 31. To address the problem, Textron resorted to a "rebate" program designed to encourage sales of the older Arctic Cat inventory and clear it from dealership floors. The program, however, depressed the company's profits. See id. Donnelly continued to discuss the status of Arctic Cat's excess aged inventory throughout 2017. For example, in July 2017 Donnelly told analysts that the company remained focused on "moving a lot of the older inventory out of the channel . . . and getting the dealer channel set up to take on a lot of that new product." App'x 32. And in October 2017 he asserted that reductions in

4

"[t]he inventory levels that we knew we needed to drive down in the dealer base" were "happening." App'x 34.

In early fall 2017, meanwhile, Textron had launched Arctic Cat's dirt and snow products for the 2018 model year. See App'x 33.

II

Most relevant to our resolution of this appeal, the complaint alleges that Donnelly made three false and misleading statements regarding Arctic Cat's inventory levels, beginning in January 2018. First, on Textron's January 2018 earnings call, Donnelly stated that the company had seen "improved demand in the snow retail channel, allowing dealers to clear older inventory and drive 2018 model sales." App'x 49–50. Second, on Textron's April 2018 earnings call, Donnelly stated that "through the course of the year" there had been "pretty significant reductions in that aged inventory" and that there was "lower inventory of aged stuff and . . . a lot of exciting new stuff [that] will be on the floors that dealers are pretty excited about." App'x 57–58. Donnelly also stated that Textron had sold very few Arctic Cat vehicles of any kind in the first quarter of 2018, which was expected given the company's seasonal sales cycle. Third, on Textron's July 2018 earnings call, Donnelly responded

5

to an analyst's question about Arctic Cat's inventory levels by stating that, although he did not "have [the] numbers at [his] fingertips," "older inventory ha[d] been moved off [dealers'] books," dealers were "taking restockings of current model year product," and "last year was great, in terms of burning down a lot of the inventory." App'x 60.

IWA claims that these statements were false because, from "early 2017 through at least the summer of 2018," Textron consistently had an inventory backlog of 22,000–25,000 Arctic Cat vehicles from model years 2015 to 2017. App'x 38. IWA points to information provided by a cadre of confidential informants to support its claim. According to one former Textron Specialized Vehicles employee, for example, non-current model year vehicles were "stacked up for miles" at Arctic Cat's headquarters in mid-to-late 2017. App'x 38. Despite Textron's (costly) efforts to sell off aged inventory using rebates, another former employee said that, even in January 2018, Textron continued to fill dealerships "back up with more aged inventory from 2015-17," which limited the dealers' demand for model year 2018 vehicles. App'x 38–39. Another former employee, a Textron Specialized Vehicles sales manager in

2017 and 2018, stated that Textron was still trying to move aged inventory through the rebate program in March 2018.

In October 2018 Textron's stock fell more than 11 percent after the company failed to meet its third quarter earnings expectations, largely due to a precipitous decline in the Industrial segment's third quarter profits from $49 million the prior year to $1 million in 2018. A leading analyst pinned the blame for the decline on Textron's Specialized Vehicles business, which had "given dealers rebates for product that isn't selling," thus costing the company "$40-50 [million] in [the third quarter]" alone. App'x 65.

III

This lawsuit was filed in August 2019. IWA was appointed lead plaintiff in November 2019 and filed an amended complaint the following month. In February 2020, after the defendants moved to dismiss the amended complaint, IWA filed the operative second amended complaint that is at issue on appeal. The defendants moved to dismiss the complaint on the ground that it failed to adequately allege any actionable misstatements or scienter. The District Court dismissed the complaint in its entirety. It held, among other things, that the complaint failed to plead that the defendants had made

7

any misrepresentations about Arctic Cat's inventory levels in violation of § 10(b) or Rule 10b-5 because the factual allegations regarding the backlog of 22,000 or more non-current vehicles "treat[] vehicles from model years 2015-17 as interchangeable." In re Textron, Inc. Sec. Litig., No. 19 Civ. 7881 (DLC), 2020 WL 4059179, at *11 (S.D.N.Y. July 20, 2020). "It would not be misleading for Textron to state that it was clearing 'older' inventory," the District Court explained, "if it had sold off 2015 and 2016 vehicles while simultaneously pushing 2017 inventory out to dealers." Id. The District Court declined to reach the issue of scienter. Id. at *13. Although it did not explicitly address IWA's § 20(a) claims, the court closed the case because such claims cannot survive absent an underlying violation of federal securities law.

**DISCUSSION**

We review de novo the grant of a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Miller v. Metro. Life Ins. Co., 979 F.3d 118, 121 (2d Cir. 2020) (quotation marks omitted). To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by

8

the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 232 (2d Cir. 2014) (quotation marks omitted). In this appeal we consider only the first element—the requirement of a material misrepresentation or omission.[1]

"Securities fraud claims are" also "subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). Under Rule 9(b) of the Federal Rules of Civil Procedure, as well as the pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4(b), plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so," Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); see Emps.' Ret. Sys. of Gov't of V.I. v. Blanford, 794 F.3d 297, 304–05 (2d Cir. 2015). A challenged statement must be "misleading, evaluated not only by literal

---

[1] The defendants contend that the element of scienter "is not at issue on appeal." Appellees' Br. 22 n.4. Absent a resolution of that issue by the District Court or briefing from the parties, we decline to address scienter in the first instance.

9

truth, but by context and manner of presentation." Singh v. Cigna Corp., 918 F.3d 57, 63 (2d Cir. 2019) (quotation marks omitted).

I

The crux of IWA's claim regarding the inventory-related statements is that in January, April, and July 2018 Donnelly made misleading statements about the company's progress in reducing its stockpile of model year 2017 and older vehicles. On appeal, Textron and the other defendants respond that these statements were not misleading when viewed in context. Specifically, they point to Donnelly's statements in 2017, which disclosed the significant challenges presented by Arctic Cat's backlog of aged inventory. The complaint acknowledges, they say, that in 2017 Textron inherited from Arctic Cat a significant inventory backlog of non-current model year products—at that point 2016 and older models—that undercut Textron's ability to sell current model year products and decreased its profits. And by the start of the class period in January 2018, the defendants continue, any reasonable investor would have recognized that the "older inventory" problem mentioned by Donnelly in his 2018 statements related to "a stockpile of Arctic Cat vehicles

that, at the least, were [model year] 2016 and older," and had nothing to do with model year 2017 vehicles. Appellees' Br. 26-27.

We disagree with the defendants that these statements from 2018 clearly referred only to model year 2016 and older vehicles, or that they comported with Textron's failure to reduce its backlog of model year 2017 and older vehicles. To start, the record viewed in the light most favorable to IWA suggests that Arctic Cat's new model year products are generally launched in the fall of the prior calendar year and before the first quarter of Textron's fiscal year. See App'x 408. Thus, Arctic Cat's 2017 models were not current as of August or September 2017. Instead, as a leading analyst research report reflected, Arctic Cat's model year 2018 sales began in "August/September" of 2017. App'x 33. And Donnelly's own comments confirm that Textron "launch[ed]" model year 2018 products in "the latter part of August into September" of 2017. Id. The parties do not dispute this point.

Insofar as the inventory-related statements that Donnelly made in July 2017 referred to the backlog of "older" or "aged" inventory, those statements clearly (and accurately) must have referred to models from 2016 or earlier, not to models from 2017. App'x 32–33. That is less clearly true, however, of the

11

first of Donnelly's 2018 statements in January 2018, made at least three full months after the 2018 model year vehicles were introduced.

Recall that Donnelly informed investors during the earnings call in January 2018 that improved demand was "allowing dealers to clear older inventory and drive 2018 model sales." App'x 35 (emphasis added). One interpretation of this statement, advanced by the defendants and endorsed by the dissent, is that it simply continues the same inventory conversation that began in early-to-mid 2017 and refers to clearing inventory from model year 2016 and earlier. See Dissenting Op. at 3-4. But the complaint plausibly alleges a competing interpretation of the statement, in which a reasonable investor would have understood Donnelly's reference to "older" inventory to include 2017 model year vehicles, as distinguished from the 2018 model year products launched a few months earlier. See Blanford, 794 F.3d at 307. Donnelly's alleged misstatements made later in 2018 (April and July) similarly contrasted "older inventory" (which, he asserted, had seen "pretty significant reductions" and had been "moved off [dealers'] books") with "exciting new stuff" being shipped to dealers. App'x 57-58, 60. The defendants' contrary and competing "explanation" for Donnelly's statements, although not

unreasonable, "is entitled to little weight at this stage of litigation," Blanford, 794 F.3d at 307, since we are required to credit the plaintiffs' plausible theory when evaluating a Rule 12(b)(6) motion.

In rejecting the plaintiffs' reading of Donnelly's statements, the District Court criticized IWA for "treat[ing] vehicles from model years 2015-17 as interchangeable." In re Textron, Inc. Sec. Litig., 2020 WL 4059179, at *11. But IWA was justified in treating the vehicles from those model years as interchangeable because Donnelly's 2018 inventory-related statements during the class period appear to have treated them the same way. Furthermore, we agree with IWA that reasonable investors would have understood from Textron's prior public statements that Textron needed a net reduction in aged inventory to "drive" current model year sales. App'x 49–50. Donnelly's 2018 inventory-related statements suggested that this reduction had occurred. The complaint alleges, however, that by the time Donnelly made the first of these statements during his earnings call in January 2018, non-current model year 2017 inventory had already accumulated at least as fast as 2016 and older inventory was selling. See App'x 37–41. Donnelly's later statements during earnings calls in April and July 2018 merely prolonged the public's

13

misimpression that the reference to "older inventory" levels included model year 2017 vehicles.  App'x 60.

Specifically, Donnelly's statements during the class period about the status of Arctic Cat's inventory backlog conflict directly with the complaint's allegations that (1) Textron had at least 22,000 Arctic Cat vehicles from model years 2015 to 2017 in its inventory from "early 2017 through at least the summer of 2018," App'x 37, and (2) Textron filled dealerships "back up" with 2015 to 2017 model year inventory during that time, App'x 38.

We therefore hold that IWA sufficiently alleged the materially misleading nature of Donnelly's 2018 statements regarding Textron's inventory.  In our view, the very able and experienced District Judge reached a contrary conclusion prematurely.  The assumption that old inventory excludes 2017 model years is inconsistent with the complaint and not one we can make at this stage of the litigation, when we must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor."  Blanford, 794 F.3d at 307 (quotation marks omitted); see also Carpenters Pension Tr., 750 F.3d at 234 (vacating a dismissal of Exchange Act claims where the district court "prematurely" concluded that the

14

plaintiffs' theory of loss causation was implausible and relied on assumptions that were "inconsistent with the complaint's allegations"). While expressing no view on the ultimate merits of IWA's theory of fraud relating to Textron's inventory, we emphasize that the District Judge's alternative interpretation of the challenged statements was not unreasonable; the case with respect to Donnelly's inventory-related statements is a close one, and we understand why the dissent supports the District Judge's view. Nevertheless, we conclude that the District Court in effect required IWA "to show that [its] reading was superior to the court's own benign reading" of those statements—a requirement we have described as error. Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 176 (2d Cir. 2015).

Finally, although the defendants urge otherwise, we also conclude that Rule 9(b)'s demand for particularity is satisfied in this case. The complaint "states with particularity the statements it alleges are misleading and the reasons why these statements are fraudulent." Blanford, 794 F.3d at 307; see id. at 306–07 (confidential witness allegations of inventory stuffed "up to the rafters" and "stored in operators' work spaces" rendered false an issuer's

15

statements that inventory was at "appropriate levels" and "not building any excess").

We therefore vacate the portion of the District Court's judgment dismissing IWA's securities fraud claims (including the § 20(a) claims) arising from the inventory statements.

II

In addition to the inventory-related statements, the complaint alleges that the defendants made material misstatements regarding the following: the status of Arctic Cat's integration into Textron's Specialized Vehicles business; Arctic Cat's performance and prospects; and the possibility that Textron might have to recognize a goodwill impairment charge. For substantially the reasons stated in the District Court's opinion and order, we affirm the dismissal of the claims arising from these alleged misrepresentations. See In re Textron, 2020 WL 4059179, at *11–13.

**CONCLUSION**

We have considered IWA's remaining arguments on appeal and conclude that they are without merit. For the foregoing reasons, we **VACATE**

the District Court's judgment as to the inventory statements and **REMAND** for further proceedings consistent with this opinion.  We **AFFIRM** the District Court's judgment as to the remainder of the statements alleged in the complaints.

KAPLAN, *District Judge*, concurring in part and dissenting in part:

I concur in the decision to the extent it affirms the judgment. I respectfully dissent insofar as it vacates its dismissal of the claims based on the alleged misrepresentations about Arctic Cat inventory. I would affirm the judgment in its entirety.

Under the heightened pleading standards of Rule 9(b) and the PSLRA, IWA's burden was to plead with particularity facts which, if proved, would establish the alleged fraud either directly or inferentially. That requires "more than say[ing] that the statements . . . were false and misleading; [plaintiff] must demonstrate with specificity why and how that is so."[1] In my view, IWA has not met this burden with respect to the alleged inventory misrepresentations. It merely has cherry-picked Donnelly's statements about inventory and urged the Court to read them as having been false or misleading, without reference to the context in which they were made and without making particularized factual allegations to support such a reading.

IWA alleges that Donnelly made three misrepresentations about Arctic Cat inventory to investment analysts and investors on earnings calls in 2018. They are, in sum and substance,

1.  Donnelly's January 31, 2018 statement that, in the fourth quarter of 2017, Textron"saw improved demand in the snow retail channel, allowing dealers to clear older inventory and drive 2018 model sales,"[2]

2.  Donnelly's April 18, 2018 statements that "both dirt and snow inventory reductions [had] happened through the course of the year," that there were "pretty significant reductions in that aged inventory," and that there was a "lower inventory of

---

[1]

*Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir. 2004); *see also* 15 U.S.C. § 78u–4(b)(1); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993).

[2]

A200 (Q4 2017 earnings call transcript).

aged stuff and . . . a lot of exciting new stuff,"[3] and

3.  Donnelly's July 18, 2018 statement that "a lot of the stuff that was really older inventory has been moved off [dealers'] books. I mean, obviously, these guys are taking re-stockings of current model year product."[4]

The district court implicitly interpreted Donnelly's references to reductions in "older," "aged," and "really older" inventory as representing that dealers had reduced the backlog of vehicles – aged model year 2016 and older – that Textron inherited in the Arctic Cat acquisition in March 2017. Interpreted in this manner, there is no factual basis alleged to support a claim that Donnelly's statements were misleading. As the district court concluded, they are not contradicted by the primary factual allegation that IWA argues makes them untrue: that there were 22,000 "non-current" Arctic Cat vehicles sitting at dealerships at all times from early 2017 to summer 2018. To illustrate, consistent with Donnelly's statements and the allegations in the second amended complaint, Textron's dealers could have reduced the "glut" of model year 2016 and older vehicles while taking on model year 2017 vehicles – once they became non-current – to account for the steadiness of the 22,000 figure.[5] In fact, the lack of change to the 22,000 figure *necessarily implies* that some version of this occurred. If dealers had not reduced the older model inventory in line with Donnelly's statements, Textron's "non-current" inventory would have ballooned in the fall of 2017 when the model year 2018 vehicle was introduced (as is the yearly practice of the industry). But the second amended complaint does not allege that this happened.

---

[3]

A344-45 (Q1 2018 earnings call transcript).

[4]

A408 (Q2 2018 earnings call transcript).

[5]

A19, A38.

The majority, albeit acknowledging the logic of this reasoning, nevertheless saves the claim based on Donnelly's inventory-related statements by reading them so that they "conflict directly" with the 22,000 figure.[6] It does this by contorting Donnelly's broad references to the reduction of "older," "aged," and "really older" inventory to mean that Textron's dealers saw a year-over-year *net* reduction in all non-current inventory, including model year 2017 vehicles.[7] But I do not believe this is proper for a number of reasons.

To begin, there are no factual allegations in the second amended complaint from which we can infer that an objectively reasonable investor would have interpreted Donnelly's statements in such a manner. In fact, such an interpretation contradicts a number of specific factual allegations in the second amended complaint.[8] All three of Donnelly's statements, though made on earnings calls in calendar year 2018, were about reductions in inventory that occurred in 2017.[9] The second amended complaint is filled with allegations about Textron's express efforts to clear out old Arctic Cat inventory during 2017, a period in which the model year 2017 vehicles largely were not aged. And, according to the complaint, Textron told investors that reducing inventory of model year

---

[6]

    *Ante* at 13-14.

[7]

    *Id.*

[8]

    *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151-52 (2d Cir.2014) ("Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the [c]omplaint.") (citation and quotation marks omitted)); *Murphy v. Morlitz*, 751 F. App'x 28, 30 (2d Cir. 2018) (rejecting defendant's argument because it was "contradict[ed] [by] relevant allegations in the complaint.").

[9]

    A200 (discussing efforts to clear inventory in Q4 2017); A344 (referring to inventory reductions that happened "through the course of the year," *i.e.*, 2017); A408 ("last year was great in terms of burning down a lot of the inventory.").

3

2016 and older vehicles – which Textron said it would focus on throughout 2017– was key to unlocking the synergies of the Arctic Cat acquisition. In this context, the only reasonable inference that can be drawn is that an investor would have understood Donnelly's statements as referring to reductions in inventory of model year 2016 and older vehicles.[10]

Instead of engaging with this context, the majority looks to the statements themselves and concludes that they nevertheless could have been interpreted as referring to model year 2017 vehicles. But none of the majority's arguments for such an interpretation is persuasive given the allegations in the second amended complaint. First, the majority notes that the model year 2017 vehicle became "non-current" in the fall of 2017 – a few months before Donnelly made the January 2018 statement[11] – so Donnelly could have been understood as referring to model year 2017 vehicles when he used the term "older inventory" at that time. But, according to the second amended complaint, Donnelly told investors that reducing the inventory of model year 2016 and older Arctic Cat vehicles would be Textron's focus for *the entirety of 2017*, without regard to the introduction of the model year 2018 vehicle.[12] So the fact that the model year 2017 vehicle was "non-current" at the time of Donnelly's statements is immaterial.

Second, the majority concludes that Donnelly's "contrast[]" between older inventory

---

[10]

*Rombach*, 355 F.3d at 172 n.7 ("The test for whether a statement is materially misleading . . . is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'") (quoting *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991)); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190-91 (2015).

[11]

*Ante* at 11-12.

[12]

*See* A31-32 (stating on an earnings call in April 2017 that "cleaning up the inventory balance and the dealers" would occur "through the balance of the year").

and model year 2018 sales leads to the inference that investors would have understood Donnelly as referring to model year 2017 and older vehicles when he spoke of older inventory.[13] But it does not explain why it believes this is so. Read in line with the other allegations in the second amended complaint, Donnelly's contrast between older and new inventory is consistent with interpreting his statements as about inventory aged model year 2016 and older. As Donnelly twice explained on earnings calls in 2017, clearing Arctic Cat's backlog of model year 2016 and older vehicles directly was tied to boosting sales of model year 2018 vehicles.[14] Indeed, if Textron's dealerships were clogged with product left over from the acquisition of Arctic Cat, the dealerships physically and financially would not be have been able to take in "exciting new stuff."[15]

Third, the majority concludes that "reasonable investors would have understood from Textron's prior public statements that Textron needed a *net* reduction in aged inventory to 'drive' current model year sales."[16] But there are no non-conclusory allegations from which this can be inferred. In fact, the allegations in the second amended complaint support the inference that investors would have understood that Textron could "drive" model year 2018 sales *without* a net

---

[13] *Ante* at 12.

[14] In July 2017, Donnelly stated that "clear[ing] out a lot of the aged inventory that was out there in the channel" before the Arctic Cat acquisition would "creat[e] room for a floor plan for [dealers] as we bring out and start to launch new product" toward the end of 2017, when the model year 2018 vehicle was launched. A149. In October 2017 – after the model year 2018 vehicle was launched – Donnelly stated that Textron's progress in "clearing out a lot of the older inventory" was helping promote "retail sell-through" of products that were just then "rolling out." A183.

[15] A345.

[16] *Ante* at 13 (emphasis in original).

5

reduction in non-current inventory. According to the complaint, the "glut" of 22,000 "non-current" vehicles was equivalent to approximately 15-23 percent of Textron's total dirt sales in 2017 and 55 percent of Textron's total snow sales in 2017.[17] Assuming that Textron's sales did not change in 2018, Textron could have used the remaining 77-85 percent of its dirt sales volume and 45 percent of its snow sales volume to "drive" model year 2018 sales.

Finally, I respectfully disagree with the majority's conclusion that the district court erred by "in effect requir[ing] IWA 'to show that [its] reading was superior to the court's own benign reading.'"[18] On the contrary, the district court correctly required IWA to plead specific factual allegations from which its proposed reading of Donnelly's statements reasonably could be inferred. The two cases that the majority primarily relies on in support of this conclusion – *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities LLC*[19] and *Employees' Retirement System of Government of the Virgin Islands v. Blanford*[20] – both relate to *factual allegations* that a district court erroneously did not interpret in the light most favorable to the plaintiff. They do not hold that a court must interpret an alleged misrepresentation as having been made in a false or misleading manner solely because plaintiff advocates for such a reading. This is precisely how IWA has pleaded the alleged inventory misrepresentations. And I believe this runs afoul of Rule 9(b) and the

---

[17] A19, 38-39 (¶¶ 77-79 & n. 13).

[18] *Ante* at 15 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176 (2d Cir. 2015)).

[19] 797 F.3d at 175-76.

[20] 794 F.3d 297, 306-07 (2d Cir. 2015).

6

PSLRA.[21]

I therefore respectfully dissent.

---

[21]

*See Rombach*, 355 F.3d at 171("The particularity requirement of Rule 9(b) serves to 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.'")(quoting *O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991)); *see also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir.2003) ("Fraud allegations may damage a defendant's reputation regardless of the cause of action in which they appear, and they are therefore properly subject to Rule 9(b) in every case."); *In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399, 1405 (9th Cir.1996) ("Rule 9(b) serves to give defendants adequate notice to allow them to defend against the charge and to deter the filing of complaints 'as a pretext for the discovery of unknown wrongs,' to protect professionals from the harm that comes from being subject to fraud charges, and to 'prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.'") (alterations omitted).